[Cite as *Coldly v. Fuyao Glass America, Inc.*, 2022-Ohio-1960.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY COUNTY

| | | |
|---|---|---|
| WILLIE COLDLY | : | |
| | : | |
| Plaintiff-Appellant | : | Appellate Case No. 29309 |
| | : | |
| v. | : | Trial Court Case No. 2020-CV-3445 |
| | : | |
| FUYAO GLASS AMERICA, INC. | : | (Civil Appeal from |
| | : | Common Pleas Court) |
| Defendant-Appellee | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 10th day of June, 2022.

. . . . . . . . . . .

MATTHEW G. BRUCE, Atty. Reg. No. 0083769, 11260 Chester Road, Suite 825, Cincinnati, Ohio 45246
      Attorney for Plaintiff-Appellant

MARC L. FLEISCHAUER, Atty. Reg. No. 0064580, 33 West First Street, Suite 200, Dayton, Ohio 45402
      Attorney for Defendant-Appellee

. . . . . . . . . . . . .

WELBAUM, J.

{¶ 1} Plaintiff-Appellant, Willie Coldly, appeals from a decision granting summary judgment to Defendant-Appellee, Fuyao Glass America, Inc. ("Fuyao"). According to Coldly, the trial court erred in rejecting his claim that Fuyao had wrongfully terminated him in violation of public policy. Coldly contends that genuine issues of material fact exist concerning this claim.

{¶ 2} We conclude that the trial court did not err in granting summary judgment to Fuyao. Coldly, an at-will employee, failed to satisfy the "jeopardy" element that must be met to maintain this type of action. Specifically, while Coldly claimed that Fuyao had failed to provide a safe workplace as required by R.C. 4101.11 and R.C. 4101.12, he did not make clear to Fuyao that he was invoking a governmental policy as the basis for his complaint about another employee, rather than his own self-interest. The record indicates that Coldly gave Fuyao no indication that his complaint concerned the public at large rather than himself. Because this failure was fatal to Coldly's claim, we need not address issues concerning the other elements needed to establish wrongful termination in violation of public policy. Accordingly, the judgment of the trial court will be affirmed.

I. Facts and Course of Proceedings

{¶ 3} On September 4, 2020, Coldly filed a complaint against Fuyao, seeking damages and an injunction based on his termination from employment with Fuyao on November 19, 2019. The complaint contained three claims: (1) wrongful termination in

violation of public policy; (2) retaliation in violation of R.C. 4112.02(I); and (3) intentional infliction of emotional distress. On October 1, 2019, Fuyao filed an answer denying liability and asserting various affirmative defenses.

{¶ 4} On April 19, 2021, Fuyao filed a motion for summary judgment. The motion was supported by Coldly's deposition and the affidavit of Reggie Jackson, who was employed by Fuyao as an Employee Relations Specialist. In the motion, Fuyao argued that Coldly could not satisfy any of the elements for establishing termination in violation of public policy. Fuyao further asserted that Coldly had failed to specify any discriminatory practice protected by R.C. 4112.02 (race, religion, sex, national origin, etc.) or that the reasons for his discharge were pretextual. Instead, Fuyao contended it had legitimate reasons for discharging Coldly, i.e., Coldly's aggressive conduct during a fight, in violation of Fuyao's policy prohibiting fighting in the workplace. Finally, Fuyao claimed that Coldly could not provide facts necessary to support a claim for intentional infliction of emotional distress.

{¶ 5} On May 13, 2021, Coldly dismissed his claims for retaliation and intentional infliction of emotional distress without prejudice, pursuant to Civ.R. 41(A)(1)(a). This left only the claim for wrongful termination in violation of public policy. Coldly then filed a memorandum on May 14, 2021, opposing the summary judgment motion. As support for his memorandum, Coldly attached an ex parte civil protective order and personnel records relating to an individual named Davion Owensby (the person with whom Coldly had had an altercation at work). On May 25, 2021, Fuyao filed a reply brief in support of its summary judgment motion.

{¶ 6} On June 21, 2021, the parties filed an agreed motion to extend the pretrial deadlines and trial date, and the court granted the motion. After holding a pretrial conference, the court issued a final pretrial order in August 2021 setting new deadlines, including a new trial date of June 13, 2022. However, on October 27, 2021, the court filed an entry and order sustaining Fuyao's summary judgment motion. Coldly then timely appealed from the court's decision.

## II. Discussion

{¶ 7} Coldly's sole assignment of error states that:

The Trial Court Erred When It Granted Summary Judgment to Defendant on Plaintiff's Claim of Wrongful Termination in Violation of Public Policy (Count 1).

{¶ 8} Under this assignment of error, Coldly contends that the trial court failed to construe the facts in the proper light and that genuine issues of material fact precluded summary judgment. In particular, Coldly argues that he established the prima facie elements of a public policy claim. According to Coldly's complaint, the public policy allegedly violated by Fuyao was that reflected in R.C. 4101.11 and R.C. 4101.12, which relates to an employer's duty to furnish a "safe" place of employment.

{¶ 9} Under established law, we review summary judgments de novo, "which means that we apply the same standards as the trial court." *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007-Ohio-2722, 873 N.E.2d 345, ¶ 16 (2d Dist.). In de novo review, we independently review trial court decisions and accord them no deference.

*Northeast Ohio Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 192, 699 N.E.2d 534 (8th Dist.1997).

{¶ 10} "Summary judgment is appropriate if (1) no genuine issue of any material fact remains, (2) the moving party is entitled to judgment as a matter of law, and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and construing the evidence most strongly in favor of the nonmoving party, that conclusion is adverse to the party against whom the motion for summary judgment is made." *State ex rel. Duncan v. Mentor City Council*, 105 Ohio St.3d 372, 2005-Ohio-2163, 826 N.E.2d 832, ¶ 9, citing *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977). " 'As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.' " *Turner v. Turner*, 67 Ohio St.3d 337, 340, 617 N.E.2d 1123 (1993), quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

{¶ 11} Concerning the summary judgment involved here, Ohio follows the law of employment at will, which generally precludes actions for damages against employers based on employment termination. *Dohme v. Eurand Am., Inc.*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, ¶ 11, citing *Collins v. Rizkana*, 73 Ohio St.3d 65, 67, 652 N.E.2d 653 (1995), and *Mers v. Dispatch Printing Co.*, 19 Ohio St.3d 100, 483 N.E.2d 150 (1985), paragraph one of the syllabus. "However, if an employee is discharged or disciplined in contravention of a clear public policy articulated in the Ohio or United States Constitution, federal or state statutes, administrative rules and regulations, or common

law, a cause of action for wrongful discharge in violation of public policy may exist as an exception to the general rule." *Id.*, citing *Painter v. Graley*, 70 Ohio St.3d 377, 639 N.E.2d 51 (1994), paragraph three of the syllabus, and *Greeley v. Miami Valley Maintenance Contrs., Inc.*, 49 Ohio St.3d 228, 551 N.E.2d 981 (1990), paragraph one of the syllabus.

{¶ 12} "To succeed on a claim for wrongful discharge in violation of public policy, a plaintiff must establish four elements: (1) that a clear public policy existed and was manifested either in a state or federal constitution, statute or administrative regulation or in the common law ('the clarity element'), (2) that dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy ('the jeopardy element'), (3) that the plaintiff's dismissal was motivated by conduct related to the public policy ('the causation element'), and (4) that the employer lacked an overriding legitimate business justification for the dismissal ('the overriding-justification element')." *Miracle v. Ohio Dept. of Veterans Servs.*, 157 Ohio St.3d 413, 2019-Ohio-3308, 137 N.E.3d 1110, ¶ 12, citing *Collins* at 69-70.

{¶ 13} "The clarity and jeopardy elements * * * are issues of law for the court's determination; the causation and overriding-justification elements are questions for determination by the fact-finder." *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 17, citing *Collins* at 70. We will begin our discussion with the clarity element.

A. Clarity

**{¶ 14}** In order "to satisfy the clarity element of a claim of wrongful discharge in violation of public policy, a terminated employee must articulate a clear public policy by citation of specific provisions in the federal or state constitution, federal or state statutes, administrative rules and regulations, or common law. A general reference to workplace safety is insufficient to meet the clarity requirement." *Dohme* at ¶ 24.

**{¶ 15}** In the complaint, Coldly cited R.C. 4101.11 and R.C. 4101.12 and also referenced regulations and the common law. Complaint at ¶ 50. However, he did not identify any specific regulations or common law principles either in the complaint or in responding to summary judgment. *See* Plaintiff's May 14, 2021 Brief in Opposition to Defendant's Motion for Summary Judgment, p. 14-17. Instead, in his summary judgment response, Coldly relied solely on the named statutes as reflecting Ohio's "public policy . . . that employees be provided with a safe work environment." *Id.* at p. 17, fn. 7.

**{¶ 16}** In granting summary judgment in Fuyao's favor, the trial court noted that Coldly had been discharged for fighting and concluded this was an appropriate decision of the employer, not for a court or a jury. Entry and Order Sustaining Motion for Summary Judgment (Oct. 27, 2021), p. 1. Additionally, the court found Fuyao's citation of *Quillen-Smith v. U.S. Bank, N.A.*, S.D.Ohio No. 3:20-cv-364, 2021 WL 1192683, *3 (Mar.30, 2021) "persuasive" as it related to R.C. 4101.11 and R101.12. *Id.* at p. 2. This refers to the holding in *Quillen-Smith* that "Ohio Revised Code §§ 4101.11 and 4101.12 fail to satisfy the 'clarity' element of a wrongful discharge claim." *Quillen-Smith* at *3, citing *Romero v. City of Middletown*, 479 F. Supp.3d 660 (S.D.Ohio 2020). *See* Defendant's Apr. 19, 2021 Motion for Summary Judgment, p. 11 (which quotes *Quillen*).

{¶ 17} According to the record, Coldly began employment at Fuyao in September 2019 as a sander, which involved scraping excess glass off windshields and using a spray bottle to clean stains and spots on windshields. Deposition of Willie Coldly ("Coldly Depo."), p. 27. Coldly worked for two days during training with Devion Owensby as his supervisor; at that time, the two men worked on first shift. After that, Owensby stayed on first shift, and Coldly moved to third shift. *Id.* at p. 32-33. Around November 1, 2019, Coldly moved to a mold operator position, but he remained on third shift. *Id.* at p. 35.

{¶ 18} During his employment, Coldly gave a co-worker (Taylor) rides home from work, and she paid him for the rides. Coldly and Taylor had met during employee orientation. *Id.* at p. 134-135. During the training process, Owensby told Coldly that he thought Taylor was "cute"; Owensby also appeared to be stalking Taylor on Facebook. After Owensby saw a disrespectful remark that Taylor had made about a man she had been with, Owensby reported to Coldly that Coldly's "girl" was talking about him. *Id.* at p. 135-136.

{¶ 19} When Coldly asked Taylor about this, she got mad because there was no relationship between them. Taylor then yelled at Owensby quite harshly in front of others. According to Coldly, Owensby then became angry with him because he was embarrassed and also began calling Coldly names at work. *Id.* at p. 136-137. This was just verbal, and Coldly did not report it to anyone at work. *Id.* at p. 137-138.

{¶ 20} Subsequently, Coldly and his wife ran into Owensby at a gas station, at which time which the two men had words. During this exchange, Coldly's wife called him back to the car because she had seen Owensby get a gun out of the trunk of his car.

After Coldly and his wife left the gas station, Owensby tried to run them off the road. At that point, they were near Coldly's house, so Coldly got out of the vehicle and told his wife to keep going. When Coldly walked to the house, Owensby pulled up on Coldly's wife, showed her the gun, said he would kill them both, and drove off. *Id.* at p. 139-140.

{¶ 21} Because of this incident, Coldly obtained an ex parte protective order from Dayton Municipal Court on November 6, 2019. The order prevented Owensby from being within 500 feet of Coldly. According to Coldly, Owensby violated the order every day at work thereafter until November 11, 2019, when a fight occurred at Fuyao. Coldly Depo. at p. 31-32, and 34; Ex. A attached to Plaintiff's Brief in Opposition to Defendant's Motion for Summary Judgment. However, Owensby was not served with the protective order until November 12, 2019, which was after the fight occurred. *Id.* at Ex. A, p. 2. Therefore, Owensby had not been in violation of the order.

{¶ 22} After obtaining the protective order, Coldly spoke to his boss, Sean McKay, on November 6, 2019, and showed him the order. *Id.* at p. 37-38. McKay told Coldly he should probably show the order to human resources ("HR"), and Coldly did so around 7:05 a.m. on November 7, 2019, after his shift had ended. *Id.* at p. 39. At that point, Coldly told Reggie Jackson, an HR employee, about what had happened. *Id.* at p. 40 and 141-142.

{¶ 23} Coldly told Jackson that "the crime that [Owensby] did was so severe to where [Coldly] didn't know if [he] was going to make it back to work that day or not because on the streets, when you pull a gun on somebody, you either pull it to kill them or they're going to get you because for the simple fact you pulled a gun on them." *Id.* at

p. 40.

**{¶ 24}** Coldly further testified that:

> And I was explaining to Reggie that we can't even see each other because once we see each other, that there's a violation. And the situation was so severe that I don't – I didn't know what my temper was going to do if I seen [sic] [Owensby] or what he was going to do to me because I felt like he was going to hurt me and I didn't know if they had – they didn't have no metal detectors or nothing, you know.

Coldly Depo. at p. 40-41.

**{¶ 25}** In response, Jackson insisted that Coldly and Owensby "be grown men and try to work with each other" and that avoiding crossing paths was not possible. *Id.* at p. 41. Jackson suggested that Owensby walk one way when coming in (for first shift) and that Coldly walk another way while leaving (third shift). Coldly said he had done that already that day and would continue doing it. *Id.* at p. 42. During this conversation, both Coldly and Owensby were in the HR department, but they were in separate rooms. *Id.* at p. 43-44. Jackson said he was going to talk to Owensby and ask him to do the same thing and stay away from Coldly. *Id.* at p. 44-45.

**{¶ 26}** Coldly doubted that Jackson had told Owensby to take a different way into his work area, because he continued to see Owensby. *Id.* at p. 46. When Coldly's shift on the morning of November 8, 2019 was ending, Coldly let his supervisor, McKay, know this approach was not working. McKay then suggested that Coldly go to the restroom five minutes early, before his shift ended. *Id.* at 47-48. Coldly followed that procedure

every day until November 11, 2019.   *Id.* at p. 48.

{¶ 27} On the morning of November 11, 2019, Coldly asked McKay to let him go to the restroom five minutes early, and McKay refused.   Coldly Depo. at p. 49.   Instead, McKay needed Coldly to go to the front of the department and take a sander's position because the people in the front were having a safety training meeting.   This was about ten minutes before Coldly's shift ended, as the first shift was coming in.   *Id.* at p. 50-51. Because Coldly was in the front sanding, Owensby would be coming in where Coldly was located.   *Id.* at p. 52.

{¶ 28} As Coldly was sanding, he saw Owensby.   *Id.*   There are factual disputes about what happened next.   According to Coldly, Owensby was making comments about the fact that Coldly was "the police," was scared, and was afraid to fight him, but he (Coldly) blew it off.   *Id.* at p. 52-53.   At that point, Owensby was talking to a lady, Laquetta, who was between the two men.   Owensby kept walking toward Coldly, and Coldly got into a "defensive mode" and put his hands up.   *Id.* at p. 53-54.   Owensby called Coldly a "5.0," which means "police."   Owensby called Coldly more names and stated that he was "scared to fight."   *Id.* at p. 54.   After Owensby called him names, Coldly called Owensby a "b**ch" and a "motherf***er."   *Id.* at p. 86.

{¶ 29} At that point, Owensby went around Laquetta and approached Coldly, but he did not have his fists up.   In his deposition, Coldly agreed that "everyone thought" he (Coldly) was "the aggressor" and was "inciting a fight."   Coldly Depo. at p. 56.

{¶ 30} According to Coldly, Owensby also told him that he was going to get Coldly outside, "like away from the job.   Like wait until I catch you."   *Id.* at p. 84.   In response,

Coldly told Owensby, "it's whatever and we can go to the bathroom," meaning they could go fight in the bathroom, "and squash the whole situation." *Id.* at p. 85. At that point, a head inspector, Mrs. Ingraham, grabbed Coldly and moved him to a corner. She stated that Fuyao would fire Coldly or both of them for that kind of thing; in response, Coldly said he had not done anything. *Id.* at p. 58-59. According to Coldly, Owensby had been close to him and he thought Owensby might spit on him or cut him with a razor. However, he did not know if Owensby actually had a razor out. Coldly did not see a razor but was worried that Owensby might have one. Owensby did not lay his hands on Coldly. *Id.* at p. 61-62 and 83-84.

{¶ 31} By this time, security had been called and had responded. Coldly told the security officer that he had a protection order against Owensby and that HR had not wanted a copy of the order. He also told the officer what had happened. *Id.* at p. 64. In response, the officer said, "[O]h, we dropped the ball," and took Coldly to the main office to write a statement. *Id.* at p. 64-65. A person (Bob Andy, who may have been in the hiring division) had Coldly write a statement, and Coldly gave him a copy of the protection order. *Id.* at p. 66-67. After that, Coldly was escorted to the front gate because his shift was over. *Id.* at p. 67.

{¶ 32} The same day, Reggie Jackson from HR called Coldly and told him he was suspended until further notice while Jackson investigated. Coldly Depo. at p. 68. On November 18, 2019, Coldly called Jackson to ask about the status of his job and left a message. *Id.* at p. 69. On November 19, 2019, Jackson called and told Coldly he was fired. *Id.* at p. 71. When Coldly asked why, Jackson initially refused to tell him and then

said it was because he had decided, during the investigation, that Coldly had been the aggressor. *Id.* at p. 71-72.

**{¶ 33}** During the investigation, Jackson had obtained statements from several witnesses, including Owensby, Laquetta Bass, and Myah Green. Ex. 1 attached to Fuyao Summary Judgment Motion, ¶ 4. According to Jackson, most witnesses indicated that Coldly was the aggressor. *Id.* Jackson concluded that both parties had used profanity and had acted inappropriately, but that Coldly had been the aggressor. *Id.* at ¶ 5. Jackson further concluded that "[e]ven if [Coldly] had not been the aggressor, Coldly specifically admitted that he had challenged Owensby to follow him to the FGA restroom to physically fight, rather than deescalate the situation." *Id.*

**{¶ 34}** As a result of the fight, Fuyao suspended Owensby without pay for three days and dismissed Coldly on November 19, 2019. *Id.* at ¶ 6-7. At some later point, Fuyao discharged Owensby for unrelated conduct. *Id.* at ¶ 6. Coldly obtained another job on December 3, 2019, at Chewy Pets, operating a picking device. After about a month, Coldly took a job with a prior employer for more money. Coldly Depo. at p. 75-77.

**{¶ 35}** In view of these facts, construed most strongly in Coldly's favor, the issue is whether genuine issues of material fact precluded summary judgment on Coldly's claim for wrongful discharge. As indicated, the "first task" in this regard is "to identify whether a clear public policy exists in Ohio" that Fuyao's conduct violated. *Collins*, 73 Ohio St.3d at 70, 652 N.E.2d 653. The statutes on which Coldly relies are R.C. 4101.11 and R.C. 4101.12, which provide, respectively, as follows:

Every employer shall furnish employment which is safe for the employees engaged therein, shall furnish a place of employment which shall be safe for the employees therein and for frequenters thereof, shall furnish and use safety devices and safeguards, shall adopt and use methods and processes, follow and obey orders, and prescribe hours of labor reasonably adequate to render such employment and places of employment safe, and shall do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees and frequenters.

No employer shall require, permit, or suffer any employee to go or be in any employment or place of employment which is not safe, and no such employer shall fail to furnish, provide, and use safety devices and safeguards, or fail to obey and follow orders or to adopt and use methods and processes reasonably adequate to render such employment and place of employment safe. No employer shall fail to do every other thing reasonably necessary to protect the life, health, safety, and welfare of such employees or frequenters. No such employer or other person shall construct, occupy, or maintain any place of employment that is not safe.

{¶ 36} The Supreme Court of Ohio has said that "Ohio public policy favoring workplace safety is an independent basis upon which a cause of action for wrongful discharge in violation of public policy may be prosecuted." *Pytlinski v. Brocar Prods., Inc.*, 94 Ohio St.3d 77, 760 N.E.2d 385 (2002), paragraph one of the syllabus.

Furthermore, R.C. 4101.11 and R.C. 4101.12 are among the statutes mentioned in *Pytlinski. Id.* at 70, fn. 2.

{¶ 37} In a later decision, however, the court stressed that "mere citation of the syllabus in *Pytlinski* is insufficient to meet the burden of articulating a clear public policy of workplace safety." *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 21. Likewise, one court has said that simply citing the statutes in the footnote in *Pytlinski* is insufficient, if a party fails "to establish that any of these statutes were applicable to his claim or had any bearing on the facts at issue in the case." *Whitaker v. First Energy Nuclear Operating Co.*, 6th Dist. Ottawa No. OT-12-021, 2013-Ohio-3856, ¶ 21.

{¶ 38} The Tenth District Court of Appeals has disagreed with *Whitaker's* conclusion that R.C. 4101.11 and R.C. 4101.12 are "too 'general and broad' to support" a claim for wrongful termination in violation of public policy. *Blackburn v. Am. Dental Ctrs.*, 2014-Ohio-5329, 22 N.E.3d 1149, ¶ 29 (10th Dist.), quoting *Whitaker* at ¶ 25. In this context, the Sixth District had said in *Whitaker* that "[t]hese statutes require employers to provide a safe workplace for their employees and are most frequently cited in premises liability and employer intentional tort cases. The statutes are very general and broad. Again, *Dohme* requires citation to specific, clear law." *Whitaker* at ¶ 25.

{¶ 39} In *Blackburn*, the plaintiffs claimed that they had reported issues arising from a dentist's conduct in their office, "generally alleging that he physically accosted or harassed appellants, threatened them, and had other violent confrontations in the workplace, including an instance in which another dentist in the same office brought a

machete to work to confront Dr. Allen. Both appellants asserted that, when they brought these problems to the attention of their superiors, they were told to ignore the situation or face termination." *Blackburn* at ¶ 20. The Tenth District Court of Appeals concluded that R.C. 4101.11 and R.C. 4101.12 together establish "that there exists a clear public policy that is manifested in a state or federal constitution, statute, or administrative regulation in Ohio favoring workplace safety for employees and frequenters." *Id.* at ¶ 27. The court therefore found that the clarity element was met and specifically disagreed with *Whitaker's* finding that the statutes were too " 'general and broad' to support such a claim." *Id.* at ¶ 28-29. *See also McMahan v. Coca-Cola Ents., Inc.*, 1st Dist. Hamilton No. C-030613, 2004 WL 2713999, \*3 (Sept. 8, 2004) (concluding, without any discussion, that the "clarity element was satisfied" because "Ohio undoubtedly has a public policy embodied as R.C. 4101.11 and 4101.12 that requires employers to provide a safe workplace").

{¶ 40} At present, the conflict in Ohio cases has not been reconciled, nor has a conflict apparently been certified to the Supreme Court of Ohio. In a more recent decision, the Sixth District continued to adhere to the position it took in *Whitaker*. *See Creveling v. Lakepark Industries, Inc.,* 2021-Ohio-764, 169 N.E.3d 21, ¶ 53 (6th Dist.). Recently, in *Jones v. Nat. Essentials*, 11th Dist. Portage No. 2021-P-0066, 2022-Ohio-1010, the court noted a split in authorities "on whether these statutory provisions [R.C. 4101.11 and 4101.12] satisfy the clarity element of a public policy claim based on workplace safety." *Id.* at ¶ 67. The docket of the Supreme Court of Ohio does not reveal that any appeal has been taken from the *Jones* decision.

{¶ 41} A judge from our court has also recently remarked that "judicial interpretation of the *Greely* clarity element is not entirely clear at all." *Trimbach v. Bath Twp.*, 2021-Ohio-2058, 175 N.E.3d 605, ¶ 21 (2d Dist.) (Tucker, J., concurring, and setting forth a suggested analysis).

{¶ 42} Lower federal courts in the Sixth Circuit are also split concerning whether the policies in R.C. 4101.11 and R.C. 4101.12 are specific enough to support claims for wrongful discharge in violation of public policy. *Compare Romero,* 479 F.Supp.3d 660, 675 (no); *Quillen-Smith,* S.D.Ohio No. 3:20-cv-364, 2021 WL 1192683, at *3 (no); *Jenkins v. Cent. Transport, Inc.*, N.D.Ohio No. 09-cv-525, 2010 WL 420027, *3 (Jan. 29, 2010) (yes); and *Tarver v. Delta Tranz, LLC*, N.D.Ohio No. 1:17-cv-01963, 2018 WL 1638644, *2 (Apr. 15, 2018) (yes). In reviewing the case law and origins of the statutes involved here, they are quite broad and appear to have been directed to the concept of premises liability.

{¶ 43} Specifically, "R.C. 4101.13 and its companion provisions, R.C. 4101.111 and 4101.12, * * * are commonly referred to as the 'frequenter' statutes. Originally enacted to benefit employees, these statutes are 'no more than a codification of the common-law duty owed by the owner or occupier of premises to business invitees to keep his premises in a reasonably safe condition and to give warnings of latent or concealed perils of which he has, or should have, knowledge.' " *Kucharski v. Natl. Eng. & Contracting Co.*, 69 Ohio St.3d 430, 432-433, 633 N.E.2d 515 (1994), quoting *Westwood v. Thrifty Boy Super Markets, Inc.*, 29 Ohio St.2d 84, 86, 278 N.E.2d 673 (1972). The court went on to note in *Kucharski* that "[t]he subsequent passage of the Ohio Workers'

Compensation Act, which protected covered employers from damage suits brought by employees injured on the job, rendered these statutes largely obsolete. They continue to be used, however, by injured employees of subcontractors who seek damages, in addition to workers' compensation benefits, from the property owners, or contractors in privity with their employers, who fail to keep the property safe from hazards for 'frequenters.' " *Id.* at 433, citing *Ford Motor Co. v. Tomlinson*, 229 F.2d 873, 879 (6th Cir.1956).

**{¶ 44}** The fact that the statues were rendered "largely obsolete" does not mean they cannot be used. Nonetheless, the Supreme Court of Ohio was not very specific in either *Pytlinski,* 94 Ohio St.3d 77, 760 N.E.2d 385, or *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, about how the clarity element should be applied.

**{¶ 45}** However, we need not decide the conflict, nor do we need to resolve what the Supreme Court meant. Assuming without deciding that the "clarity" element was satisfied, Coldly failed to meet what is needed for the "jeopardy" element. That is fatal to his claim.

## B.   Jeopardy Element

**{¶ 46}** As noted, the jeopardy element considers whether " 'dismissing employees under circumstances like those involved in the plaintiff's dismissal would jeopardize the public policy.' " *Miracle*, 157 Ohio St.3d 413, 2019-Ohio-3308, 137 N.E.3d 1110, at ¶ 12, citing *Collins*, 73 Ohio St.3d at 69-70, 652 N.E.2d 653. Concerning "jeopardy," the Sixth Circuit Court of Appeals held some time ago that:

*[T]he employee must at least have made clear to his employer that he is invoking a governmental policy as the basis for his complaint, not just his own self-interest.   Otherwise, the employer is not effectively put on notice that the employee is acting not only for himself, but also for the public at large.*   The "jeopardy" element does not state simply that the policy has been violated, but that the policy itself is at risk if dismissals like the one in question are allowed to continue.   The Ohio Supreme Court views employee complaints and whistleblowing as critical to the enforcement of the State's public policy, and the Court therefore intended to make employees de facto "enforcers" of those policies.   Toward this end, the Court granted them special protection from Ohio's generally applicable at-will employment status when the employees act in this public capacity.   In exchange for granting employees this protection, employers must receive notice that they are no longer dealing solely with an at-will employee, but with someone who is vindicating a governmental policy.   Employers receive clear notice of this fact when actual government regulators arrive to audit or inspect.   They should receive some similar notice when an employee functions in a comparable role.   Even though an employee need not cite any specific statute or law, his statements must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints.

(Emphasis added.)   *Jermer v. Siemens Energy & Automation, Inc.*, 395 F.3d 655, 659

(6th Cir.2005). *Accord Allman v. Walmart, Inc.*, 967 F.3d 566, 574 (6th Cir.2020).

{¶ 47} While the Supreme Court of Ohio has not specifically commented on this point, several Ohio appellate districts agree with *Jermer*. *See Jones*, 11th Dist. Portage No. 2021-P-0066, 2022-Ohio-1010, at ¶ 68 (" 'a plaintiff who cites workplace safety as the public policy satisfying the clarity element ... must have at least lodged complaints about workplace safety in order to satisfy the jeopardy element of the claim.' "); *Beckloff v. Amcor Rigid Plastics USA, LLC*, 2017-Ohio-4467, 93 N.E.3d 329, ¶ 42 (6th Dist.); *Zwiebel v. Plastipak Packaging, Inc.*, 3d Dist. Shelby No. 17-12-20, 2013-Ohio-3785, ¶ 32; and *Gaskins v. Mentor Network-REM*, 8th Dist. Cuyahoga No. 94092, 2010-Ohio-4676, ¶ 17 ("employee's statements 'must indicate to a reasonable employer that he is invoking governmental policy in support of, or as the basis for, his complaints' ").

{¶ 48} The only Ohio decision criticizing *Jermer* is a decision from our court that was vacated by the Supreme Court of Ohio. *See Dohme v. Eurand Am., Inc.*, 170 Ohio App.3d 593, 2007-Ohio-865, 868 N.E.2d 701 (2d Dist.) (*Dohme I*), *vacated for lack of final appealable order*, 121 Ohio St.3d 277, 2009-Ohio-506, 903 N.E.2d 1174. Later, after a final order was entered, we stated that "we believe our decision in *Dohme v. Eurand Am., Inc.*, 170 Ohio App.3d 593, 2007-Ohio-865, 868 N.E.2d 701, is correct, and we adopt that decision here in its entirety." *Dohme v. Eurand Am., Inc.*, 189 Ohio App.3d 343, 2010-Ohio-3905, 938 N.E.2d 417, ¶ 8 (2d Dist.) (*Dohme II*).

{¶ 49} The case was then appealed to the Supreme Court of Ohio, and the court reversed our decision. *See Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825. The basis for reversal was that the employee had "failed to meet his requisite

burden to articulate, by citation to its source, a specific public policy that [the employer] violated when it discharged him." *Id.* at ¶ 19. In reversing, the court criticized the fact that we had *sua sponte* presumed to identify the source of the public policy when the employee failed to do so. *Id.* at ¶ 23.

{¶ 50} Since that time, no courts, including our own, have cited *Dohme II.* Courts in the Sixth Circuit have also generally not considered the content in *Dohme I.* *E.g.,* *Trout v. FirstEnergy Generation Corp.*, 339 Fed.Appx. 560, 567 (6th Cir.2009) (finding the decision had no precedential value since it was vacated); *Allman v. Walmart Inc.*, S.D.Ohio No. 2:18-cv-369, 2019 WL 529572, *4, fn. 2 (Feb. 11, 2019), *aff'd,* 967 F.3d 566 (6th Cir.2020) (noting the "decision was vacated by the Ohio Supreme Court on other grounds, and the Ohio Supreme Court expressly declined to consider the jeopardy element" in its later decision in *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825).

{¶ 51} We have cited *Dohme I* twice since it was vacated, and neither case dealt with jeopardy or notice. In one case, we stated that *Dohme I* had been "reversed" (rather than vacated) and rejected an employee's claim because the cited Ohio Building Codes did not establish a "clear public policy." *McGlothen v. City of Fairborn,* 2019-Ohio-141, 127 N.E.3d 527, ¶ 19-20 (2d Dist.).

{¶ 52} In the second case, we quoted *Dohme I* only for the proposition that " 'to prevail on his claim, [the employee] must carry his burden to prove the remaining elements of a wrongful-discharge claim.' " *Sutton v. Tomco Machining, Inc.*, 186 Ohio App.3d 757, 2010-Ohio-830, 930 N.E.2d 815, ¶ 40 (2d Dist.), quoting *Dohme I*, 170 Ohio

App.3d 593, 2007-Ohio-865, 868 N.E.2d 701, at ¶ 38. *Sutton* was issued after the Supreme Court of Ohio vacated *Dohme I,* and before we had filed our decision in *Dohme II*, but we did not mention the fact that the decision had been vacated. In any event, *Sutton* did not address the issue of whether the employee made a complaint or was acting on his own behalf rather than the public at large. In fact, the employee there could not have complained, because he was discharged from employment an hour after he had reported an injury to his employer and before he filed a workers' compensation claim. *Id.* at ¶ 1.

{¶ 53} As noted, the Supreme Court of Ohio reversed our judgment in *Dohme II* because the employee failed to meet the burden of citing to a specific source and because our court had improperly made "sua sponte articulation of a public policy favoring workplace fire safety, which was supported by citation of various state and federal statutes and regulations." *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 22. Because this disposed of the case, the court declined to consider the two additional issues for review, including whether the employee's termination "jeopardized public policy." *Id.* at ¶ 26. Based on that fact, one could argue that we are bound by a prior panel's decision unless we overrule it after convening an en banc proceeding. *E.g., McFadden v. Cleveland State Univ.*, 120 Ohio St.3d 54, 2008-Ohio-4914, 896 N.E.2d 672, ¶ 15-16. On the other hand, in contrast to our statement in *Dohme I*, the landscape has changed. As noted, four Ohio appellate districts have subsequently agreed with *Jermer.* These decisions did not exist when we issued *Dohme I.*

{¶ 54} However, even if this were otherwise, *Dohme I* (and its adoption in *Dohme*

*II)* are both non-precedential and distinguishable. *Dohme II* did not discuss any facts or law, so we will refer to the earlier decision in *Dohme I.*

{¶ 55} In *Dohme I*, we noted that the plaintiff was injured when a fire-alarm malfunctioned at his place of employment, and he reported fire-safety problems to the local fire department. *Dohme I*, 170 Ohio App.3d 593, 2007-Ohio-865, 868 N.E.2d 701, at ¶ 2. After that occurred, the plaintiff was reassigned to duties that included responsibilities relating to the fire system. *Id.* at ¶ 3. Subsequently, the company informed its employees that "an insurance inspector would be visiting * * * to perform a site survey and risk assessment." *Id.* at ¶ 4. The plaintiff believed the "inspector was there to rate how safe the facility was." *Id.* However, the employer "instructed its employees not to speak to the inspector, but identified certain employees in the e-mail who had permission to speak to the inspector." *Id.* The plaintiff "was not identified in the e-mail as an individual with permission to speak to the inspector." *Id.*

{¶ 56} When the inspector arrived, the plaintiff was asked to greet him because another employee was not available. At that point, the plaintiff gave the inspector a computer printout showing overdue inspections. A recent overdue inspection was not included, and the plaintiff told the inspector he might want to "check" about what happened with that inspection. *Id.* at ¶ 5. The plaintiff testified that he was concerned he would be blamed. Two days after this conversation, the plaintiff was fired. *Id.*

{¶ 57} The trial court's resolution of the case on summary judgment was based solely on the "clarity" element and did not discuss the other public policy elements. This dismissal was due to the plaintiff's failure to articulate what public policy had been violated

when he was discharged. *Id.* at ¶ 11-13. We reversed the trial court on this ground, finding "a clear public policy favoring workplace fire safety." *Id.* at ¶ 24. In this context, we cited federal and state statutes and Ohio regulations, which, as the Supreme Court later stressed, the plaintiff had not raised. *Dohme*, 130 Ohio St.3d 168, 2011-Ohio-4609, 956 N.E.2d 825, at ¶ 23, referencing *Dohme I*.

{¶ 58} At that point, we did not need to address any further issues, as the trial court had not ruled on the remaining public policy elements. However, we went ahead and discussed the employer's contention that the jeopardy element was not satisfied. We noted the employer had supported its argument with four cases, one of which was *Jermer*. *Dohme I*, 170 Ohio App.3d 593, 2007-Ohio-865, 868 N.E.2d 701, at ¶ 29. The discussion of jeopardy, including *Jermer*, can fairly be classified as dicta. Specifically, it was unnecessary, since we had already decided to reverse the trial court on the only point it had considered. "Dicta in one case has no binding effect in other cases." *Hicks v. State Farm Mut. Auto. Ins. Co.*, 2017-Ohio-7095, 95 N.E.3d 852, ¶ 52 (2d Dist.), citing *Cosgrove v. Williamsburg of Cincinnati Mgt. Co.*, 70 Ohio St.3d 281, 284, 638 N.E.2d 991 (1994). " 'Dicta includes statements made by a court in an opinion that are not necessary for the resolution of the issues. * * * Dicta is not authoritative, and, by definition, cannot be the binding law of the case.' " *Id.*, quoting *Gissiner v. Cincinnati*, 1st Dist. Hamilton No. C-070536, 2008-Ohio-3161, ¶ 15. Consequently, we do not consider *Dohme I* (or its adoption in *Dohme II*) precedential.

{¶ 59} Furthermore, as to these cases being distinguishable, we first found that *Jermer* was not relevant because the employer in *Jermer* had already decided to fire the

employee due to his prior conduct in the work place. The firing decision occurred before the employee contacted the employer's hot-line to complain about the fact that the employer had failed to address his air-quality concerns. *Dohme I*, 170 Ohio App.3d 593, 2007-Ohio-865, 868 N.E.2d 701, at ¶ 30, discussing *Jermer*, 395 F.3d at 658. In contrast, the plaintiff in *Dohme I* "was not fired for prior conduct, but rather was fired for his conversation with the insurance inspector." *Id.* We then said that:

> We disagree with *Jermer's* implication that an employee must make some formal announcement that his statements are being made for the purpose of protecting the public policy favoring workplace-safety. Employers are presumed to be sophisticated enough to comply with the workplace safety laws. When an employer directs employees to not speak to an insurance representative inspecting a premises, an implication arises that the employer wishes to cover up defects, including those that create a danger to employees.

*Id.* at ¶ 32.

{¶ 60} After reviewing *Jermer* as well as the Ohio cases agreeing with it, we are not persuaded that it requires a "formal" announcement. In *Jermer*, the court indicated that, "[w]hile such a complaint need not always be in writing, it must do more than merely indicate a preference or make a vague statement. It must at least connect the employer's conduct in some way to government policy relating to employee health." *Id.* at 659. This is not a command to make a "formal" announcement. Notably, the focus is on the employee's pursuit of his own self-interest rather than the interests of the public

at large.

{¶ 61} In *Jermer*, the plaintiff had a brief conversation with a supervisor while walking to an unrelated meeting. The plaintiff asked how an air quality project was going and asked if the supervisor needed any help with re-testing. *Jermer* at 657. During the conversation, the employee said, "I still think there's some issues." *Id*. In response to the employee's offer to help, the supervisor said, " 'we'll see.' " *Id*. The employee had also previously asked for an air filter for his office. *Id*. at 659.

{¶ 62} As noted, the plaintiff later made a specific call to the employer's hotline, but this occurred after the employer had already decided to discharge him, due to a downturn caused by the September 11, 2001 attacks, and the fact that the plaintiff was the lowest-rated employee in his department. *Id*. at 658. The Sixth Circuit, while discussing the need to alert the employer, noted that the plaintiff's "off-the-cuff statement 'I still think there's issues' while discussing outstanding projects was neither clear nor specific enough to rise to the level of a complaint about possible violation of a governmental policy." *Id*. at 659. In addition, the court remarked that the plaintiff's "request for an air filter in his office was more in the nature of a request to turn the air conditioner or heat up or down. It is similar to a request to keep a window open so that the office will have more fresh air." *Id*.

{¶ 63} Furthermore, the facts in *Dohme I* are different than those involved here. Failure to have functioning fire alarms could injure many employees, and what is worse, the employer deliberately prevented employees from communicating with an inspector. In contrast, the record here is devoid of any evidence that Coldly was acting on behalf of

the public at large or on behalf of anything other than his own self-interest.

{¶ 64} In arguing that this is not the case, Coldly points to the fact that before he filed "his complaint with Employee Relations, Owensby had confronted Coldly at work, got in his face, and called him 'n* * * * * * ' because he was upset that Taylor had yelled at him." Appellant's Brief at p. 19, citing Coldly Depo. at p. 137. In addition, Coldly argues that Owensby "had pulled guns on employees at Fuyao before and 'has a big problem with, you know, pulling guns and fighting.' " *Id.*, citing Coldly Depo. at p. 74. According to Coldly, these concerns led him to file a complaint with HR that was very specific about Owensby's actions and Coldly's "concerns for the safety of himself and others." Appellant's Brief at p, 19.

{¶ 65} These "facts" are either incorrect or taken out of context. On November 7, 2019, Coldly informed HR about the protective order that had been granted. It was not a complaint about employee safety in general; Coldly was discussing this issue in conjunction with his own concerns. Nothing in the record suggests otherwise about this discussion.

{¶ 66} The incident discussed on page 137 of Coldly's deposition refers to an encounter that occurred before the protective order was issued and before Coldly talked to HR. At that point, Owensby "got in" Coldly's face and called him a name because he was upset about what Coldly had told Taylor. *However, Coldly did not report that to anyone at Fuyao. Id.* Thus, based on this incident, Fuyao had no reason to conclude that Coldly was concerned about the safety of other employees (or even about himself), because Fuyao did not even know about it.

**{¶ 67}** As noted, page 19 of Coldly's brief refers to page 74 of the deposition and comments that "Owensby had pulled guns on employees at Fuyao before and 'has a big problem with you know, guns and not fighting.' " The implication here is that Fuyao knew that Owensby brought guns to work and, therefore, should have known that Coldly was not just acting on his own behalf, but on behalf of other employees as well.

**{¶ 68}** However, this part of Coldly's deposition refers to a conversation that Coldly had with Laquetta Bass at Wal-Mart *after* the November 11, 2019 fight. Coldly did not specify the date of the conversation, but it was clearly after the fight for which Coldly was terminated. Coldly Depo. at p. 73-74. On that day, Laquetta asked if Coldly had lost his job, and he replied, "not that I know of, I mean I'm on suspension." *Id.* at p. 73. The suspension did not occur until after the fight.

**{¶ 69}** Coldly then said in his deposition:

> And then she [Laquetta] was saying that they had came [sic] and talked to – tried to talk to her, but she said that she wasn't going to be in it. And I was like, well, you seen [sic] what happened. And she said yes. And she was just saying that the dude has a big problem with, you know, pulling guns and not fighting, but she said that she wasn't going to get in it. She said they did come and talk to her, but she didn't – she said she wasn't going to get in it. But obviously she did.

Coldly Depo. at p. 73-74.

**{¶ 70}** Again, this conversation occurred after the fighting incident for which Coldly was terminated. This employee did not say that she saw Owensby pulling guns on other

employees or fighting at work, nor did she say that HR had been told about these things before the November 11, 2019 fight. Again, there is no evidence that Fuyao knew about Owensby pulling guns on employees or fighting.

{¶ 71} Finally, Coldly's brief also refers to his conversation with Reggie Jackson of HR (about the protective order) and states that Coldly was acting with respect to others' safety because it was Owensby's "history of pulling guns on other employees at Fuyao that led Coldly to tell Jackson 'we do not need to cross paths.' " Appellant's Brief at p. 20, citing Coldly Depo. at p. 41. In this point in his deposition, Coldly stated that "I had heard [Owensby] had come up there and he pulled a gun on another employee so that's why I was telling Reggie, like, we do not need to cross paths." *Id*.

{¶ 72} However, Coldly did not say that he actually told Jackson this; he was explaining why he told Jackson that he and Owensby did not need to cross paths. Furthermore, this was in the context of telling Jackson that "the situation was so severe" that a protective order violation would occur if the two men saw each other and that, in such a situation, Coldly "didn't know what [his] temper was going to do" if he saw Owensby because he felt like Coldly was going to hurt him. Coldly Depo. at p. 40-41. Again, this was a concern about Coldly's own safety, not that of other employees or public safety at large.

{¶ 73} Based on the preceding discussion, there is no indication in the record that Coldly was concerned about danger to anyone other than himself during this course of events or that his complaint to HR was related to concern about the public at large rather than his own interests. Accordingly, Coldly's claim failed to meet the jeopardy element,

and the trial court did not err in granting summary judgment in Fuyao's favor.

**{¶ 74}** While our decision is based on a reason other than what the trial court expressed, "[a]n appellate court may affirm based on different reasoning than found by a trial court, but an appellate court cannot disturb a judgment or order that is legally correct based on different reasoning." *John A. Becker Co. v. Jedson Eng., Inc.*, 2018-Ohio-3924, 121 N.E.3d 788, ¶ 19 (2d Dist.), citing *State ex rel. Sommers v. Perkins Local Schools Bd. of Edn.*, 2017-Ohio-7991, 98 N.E.3d 1117, ¶ 26 (6th Dist.). "The fundamental questions in an appeal are, one, whether the appealed decision itself is erroneous and, two, whether that error is prejudicial. A decision that achieves the right result must be affirmed, even if the wrong reasoning is used to justify the decision, because an error in reasoning is not prejudicial." *Id.*, citing *Sommers* at ¶ 26.

**{¶ 75}** The remaining issues in Coldly's brief involve whether genuine issues of material fact existed concerning the other two elements in the public policy equation: "causation" (whether Fuyao was motivated by conduct related to the public policy) and "overriding-justification" (whether Fuyao had an overriding business justification for the dismissal). Because the failure to satisfy the jeopardy element is fatal to Coldly's claim, these issues will not be considered. The issue as to the "clarity" finding also need not be considered, since the judgment is being affirmed on a different basis.

**{¶ 76}** Based on the preceding discussion, Coldly's sole assignment of error is overruled.

### III. Conclusion

{¶ 77} Coldly's assignment of error having been overruled, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, P.J. and LEWIS, J., concur.


Copies sent to:

Matthew G. Bruce
Marc L. Fleischauer
Hon. Robert G. Hanseman